**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **PERSONALIZED MEDIA COMMUNICATIONS, L.L.C.,** | |
| **Plaintiff,** | Case No. 2:08-CV-00070 [TJW] |
| **v.** | |
| **MOTOROLA, INC., ECHOSTAR CORP., AND DISH NETWORK CORP. f/k/a ECHOSTAR COMMUNICATIONS CORP.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## ECHOSTAR DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF PERSONALIZED MEDIA COMMUNICATIONS LLC'S COMPLAINT FOR PATENT INFRINGEMENT

Defendants EchoStar Corp. and DISH Network Corp. f/k/a EchoStar Communications Corp. ("DISH Network") (collectively the "EchoStar Defendants") respectfully submit their Answer, Affirmative Defenses, and Counterclaims to the complaint for patent infringement filed by Personalized Media Communications, L.L.C. ("PMC"), and state as follows:

### NATURE OF THE ACTION

1.      The EchoStar Defendants admit that PMC's complaint purports to be an action for patent infringement under Title 35 of the United States Code.  The EchoStar Defendants further admit that PMC is seeking injunctive relief and monetary damages.  Except as expressly admitted, the EchoStar Defendants deny each and every remaining allegation of paragraph 1.

## THE PARTIES

2.      The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 2, and on that basis deny each and every allegation in paragraph 2.

3.      The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 3, and on that basis deny each and every allegation in paragraph 3.

4.      The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 4, and on that basis deny each and every allegation in paragraph 4.

5.      Admit.

6.      Admit.

## JURISDICTION AND VENUE

7.      The EchoStar Defendants admit that this action purports to arise under the laws of the United States, including Title 35 of the United State Code.  The EchoStar Defendants deny each and every remaining allegation of paragraph 7.

8.      The EchoStar Defendants admit that this Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1338(a) inasmuch as PMC's Complaint purports to state claims arising under the patent laws of the United States of America.  Except as expressly admitted, the EchoStar Defendants deny each and every remaining allegation of paragraph 8.

9.      The EchoStar Defendants admit that this Court has personal jurisdiction over EchoStar Corp. and the DISH Network.  Except as expressly admitted, the EchoStar Defendants deny each and every remaining allegation of paragraph 9.

10.      The EchoStar Defendants admit that the Eastern District of Texas is one of several venues that could hear this action pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).  Except

as expressly admitted, the EchoStar Defendants deny each and every remaining allegation of paragraph 10.

## INFRINGEMENT OF THE HARVEY PATENTS

11.     The EchoStar Defendants admit that a copy of U.S. Patent No. 4,694,490, entitled "Signal Processing Apparatus and Methods" was attached as Exhibit A to the complaint.  The EchoStar Defendants admit that the copy of the '490 patent states that it was issued on September 15, 1987.  The EchoStar Defendants deny that the '490 patent was duly and lawfully issued.  The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the remaining allegations in paragraph 11, and on that basis deny each and every remaining allegation in paragraph 11.

12.     The EchoStar Defendants admit that a copy of U.S. Patent No. 4,965,825, entitled "Signal Processing Apparatus and Methods" was attached as Exhibit B to the complaint.  The EchoStar Defendants admit that the copy of the '825 patent states that it was issued on October 23, 1990.  The EchoStar Defendants deny that the '825 patent was duly and lawfully issued.  The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the remaining allegations in paragraph 12, and on that basis deny each and every remaining allegation in paragraph 12.

13.     The EchoStar Defendants admit that a copy of U.S. Patent No. 5,109,414, entitled "Signal Processing Apparatus and Methods" was attached as Exhibit C to the complaint.  The EchoStar Defendants admit that the copy of the '414 patent states that it was issued on April 28, 1982.  The EchoStar Defendants deny that the '414 patent was duly and lawfully issued.  The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the remaining allegations in paragraph 13, and on that basis deny each and every remaining allegation in paragraph 13.

14.     The EchoStar Defendants admit that a copy of U.S. Patent No. 5,233,654, entitled "Signal Processing Apparatus and Methods" was attached as Exhibit D to the complaint.  The EchoStar Defendants admit that the copy of the '654 patent states that it was issued on August 3,

1993.  The EchoStar Defendants deny that the '654 patent was duly and lawfully issued.  The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the remaining allegations in paragraph 14, and on that basis deny each and every remaining allegation in paragraph 14.

15.     The EchoStar Defendants admit that a copy of U.S. Patent No. 5,335,277, entitled "Signal Processing Apparatus and Methods" was attached as Exhibit E to the complaint.  The EchoStar Defendants admit that the copy of the '277 patent states that it was issued on August 2, 1994.  The EchoStar Defendants deny that the '277 patent was duly and lawfully issued.  The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the remaining allegations in paragraph 15, and on that basis deny each and every remaining allegation in paragraph 15.

16.     The EchoStar Defendants admit that a copy of U.S. Patent No. 5,887,243, entitled "Signal Processing Apparatus and Methods" was attached as Exhibit F to the complaint.  The EchoStar Defendants admit that the copy of the '243 patent states that it was issued on March 23, 1999.  The EchoStar Defendants deny that the '243 patent was duly and lawfully issued.  The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the remaining allegations in paragraph 16, and on that basis deny each and every remaining allegation in paragraph 16.

17.     To the extent that the allegations in paragraph 17 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 17, and on that basis deny each and every allegation in paragraph 17.

18.     To the extent that the allegations in paragraph 18 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants

lack sufficient information or knowledge either to admit or deny the allegations in paragraph 18, and on that basis deny each and every allegation in paragraph 18.

19.     To the extent that the allegations in paragraph 19 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 19, and on that basis deny each and every allegation in paragraph 19.

20.     To the extent that the allegations in paragraph 20 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 20, and on that basis deny each and every allegation in paragraph 20.

21.     The EchoStar Defendants admit that they own and operate a DBS system that includes uplink facilities and that the system transmits program content to its subscribers.  The EchoStar Defendants admit that they provide a variety of set-top boxes to their subscribers.  The EchoStar Defendants deny that they infringe, contribute to infringement of, or induce infringement of any valid, enforceable claims in the PMC patents.  The EchoStar Defendants deny the remaining allegations in paragraph 21.

22.     The EchoStar Defendants deny the allegations in paragraph 22.

23.     The EchoStar Defendants deny the allegations in paragraph 23.

24.     The EchoStar Defendants deny the allegations in paragraph 24.

25.     The EchoStar Defendants admit that they received a letter from PMC regarding some of the PMC Patents.  To the extent that the remaining allegations in paragraph 25 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 25, and on that basis deny each and every allegation in paragraph 25.

26.     To the extent that the allegations in paragraph 26 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 26, and on that basis deny each and every allegation in paragraph 26.

27.     To the extent that the allegations in paragraph 27 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 27, and on that basis deny each and every allegation in paragraph 27.

## COUNT I

28.     The EchoStar Defendants repeat and incorporate by reference their responses to paragraphs 1-27 as if fully set forth herein.

29.     The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 29, and on that basis deny each and every allegation in paragraph 29.

30.     The EchoStar Defendants admit that the claims of the '490 patent are part of a reexamination proceeding that is pending before the Board of Patent Appeals and Interferences. To the extent that the remaining allegations in paragraph 30 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 30, and on that basis deny each and every allegation in paragraph 30.

31.     To the extent that the allegations in paragraph 31 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants

lack sufficient information or knowledge either to admit or deny the allegations in paragraph 31, and on that basis deny each and every allegation in paragraph 31.

**COUNT II**

32.     The EchoStar Defendants repeat and incorporate by reference their responses to paragraphs 1-31 as if fully set forth herein.

33.     The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 33, and on that basis deny each and every allegation in paragraph 33.

34.     The EchoStar Defendants admit that the claims of the '825 patent are part of a reexamination proceeding that is pending before the Board of Patent Appeals and Interferences. To the extent that the remaining allegations in paragraph 34 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 34, and on that basis deny each and every allegation in paragraph 34.

35.     To the extent that the allegations in paragraph 35 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 35, and on that basis deny each and every allegation in paragraph 35.

**COUNT III**

36.     The EchoStar Defendants repeat and incorporate by reference their responses to paragraphs 1-35 as if fully set forth herein.

37.     The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 37, and on that basis deny each and every allegation in paragraph 37.

38.     The EchoStar Defendants admit that the claims of the '414 patent are part of a reexamination proceeding that is pending before the Board of Patent Appeals and Interferences. To the extent that the remaining allegations in paragraph 38 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 38, and on that basis deny each and every allegation in paragraph 38.

39.     To the extent that the allegations in paragraph 39 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 39, and on that basis deny each and every allegation in paragraph 39.

**COUNT IV**

40.     The EchoStar Defendants repeat and incorporate by reference their responses to paragraphs 1-39 as if fully set forth herein.

41.     The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 41, and on that basis deny each and every allegation in paragraph 41.

42.     The EchoStar Defendants admit that the claims of the '654 patent were part of a reexamination proceeding before the United States Patent and Trademark Office.  To the extent that the remaining allegations in paragraph 42 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 42, and on that basis deny each and every allegation in paragraph 42.

43.     To the extent that the allegations in paragraph 43 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed

toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 43, and on that basis deny each and every allegation in paragraph 43.

## COUNT V

44.     The EchoStar Defendants repeat and incorporate by reference their responses to paragraphs 1-43 as if fully set forth herein.

45.     The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 45, and on that basis deny each and every allegation in paragraph 45.

46.     The EchoStar Defendants admit that the claims of the '277 patent are part of a reexamination proceeding that is pending before the Board of Patent Appeals and Interferences. To the extent that the remaining allegations in paragraph 46 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 46, and on that basis deny each and every allegation in paragraph 46.

47.     To the extent that the allegations in paragraph 47 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 47, and on that basis deny each and every allegation in paragraph 47.

## COUNT VI

48.     The EchoStar Defendants repeat and incorporate by reference their responses to paragraphs 1-47 as if fully set forth herein.

49.     The EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 49, and on that basis deny each and every allegation in paragraph 49.

50.     The EchoStar Defendants admit that the claims of the '243 patent are part of a reexamination proceeding that is pending before the Board of Patent Appeals and Interferences. To the extent that the remaining allegations in paragraph 50 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 50, and on that basis deny each and every allegation in paragraph 50.

51.     To the extent that the allegations in paragraph 51 are directed at the EchoStar Defendants, the EchoStar Defendants deny them.  To the extent that such allegations are directed toward activities of defendants other than the EchoStar Defendants, the EchoStar Defendants lack sufficient information or knowledge either to admit or deny the allegations in paragraph 51, and on that basis deny each and every allegation in paragraph 51.

## JURY DEMAND

52.     Paragraph 52 does not include an allegation that requires a response from the EchoStar Defendants.

The EchoStar Defendants deny each and every allegation not specifically admitted herein.

## PMC'S PRAYER FOR RELIEF

The EchoStar Defendants deny that PMC is entitled to any of the relief it seeks.


## THE ECHOSTAR DEFENDANTS' AFFIRMATIVE DEFENSES

Without admitting or acknowledging that they bear the burden of proof as to any of them, the EchoStar Defendants assert the following affirmative defenses on information and belief:

### First Affirmative Defense
### (Non-Infringement)

53.     PMC is not entitled to any relief from the EchoStar Defendants because the EchoStar Defendants are not infringing, and have not infringed, either literally or under the

doctrine of equivalents, directly, by inducement, contributorily, or in any way, any valid, enforceable claim of U.S. Patent Nos. 4,694,490; 4,965,825; 5,109,414; 5,233,654; 5,335,277; and 5,887,243 (the "Asserted PMC Patents").  If the claims at issue are interpreted so broadly as to read on any of the EchoStar Defendants' products or services, the EchoStar Defendants do not and have not infringed, induced infringement of, or contributed to the infringement of, any valid claim of the Asserted PMC Patents under the Reverse Doctrine of Equivalents.

### Second Affirmative Defense
### (Patent Invalidity)

54.    The Asserted PMC Patents, and all of their claims, are invalid under one or more sections of Title 35 of the U.S. Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine of obviousness-type double patenting.

### Third Affirmative Defense
### (Scope of the Prior Art)

55.    The prior art known before the alleged invention covered by the Asserted PMC Patents limits and restricts the scope of the Asserted PMC Patents so that the EchoStar Defendants do not infringe any valid, enforceable claims of the Asserted PMC Patents.

### Fourth Affirmative Defense
### (Prosecution History Estoppel)

56.    On the basis of proceedings in the Patent and Trademark Office during prosecution of the applications that matured into the Asserted PMC Patents and of statements made by or on behalf of the named inventors, PMC is estopped from construing the Asserted PMC Patents to cover the accused product(s).

### Fifth Affirmative Defense
### (Statute of Limitations)

57.    PMC's claims against the EchoStar Defendants are barred by the statute of limitations set out in 35 U.S.C. § 286 to the extent that the EchoStar Defendant's alleged infringement occurred more than six years prior to PMC filing this action.

## Sixth Affirmative Defense
### (Waiver, Laches, and Equitable Estoppel)

58.     Each of PMC's claims against the EchoStar Defendants is barred, in whole or in part, by the doctrine of laches, waiver, and/or equitable estoppel due to PMC's unreasonable delay in bringing this suit.

## Seventh Affirmative Defense
### (License and Estoppel)

59.     Each of PMC's claims against the EchoStar Defendants is barred, in whole or in part, by the defenses of license and estoppel.

## Eighth Affirmative Defense
### (Adequate Remedy at Law)

60.     PMC has an adequate remedy at law, and no basis exists for the grant of equitable relief.

## Ninth Affirmative Defense
### (Failure to State a Claim)

61.     PMC's causes of action fail to state a clam upon which relief may be granted.

## Tenth Affirmative Defense
### (Prosecution Laches)

62.     Each of PMC's claims for relief is barred, in whole or in part, by the doctrine of prosecution laches by reason of its unreasonable and unexplained delay in the prosecution of the Asserted PMC Patents.

## Eleventh Affirmative Defense
### (Inequitable Conduct)

63.     The Asserted PMC Patents are unenforceable because the patents were obtained through inequitable conduct before the United States Patent and Trademark Office.  One or more agents of PMC, its predecessors-in-interest, the applicants, or the inventors were under a duty of candor and good faith, including a duty of disclosure, in dealing with the PTO.  As described herein, one or more of these agents violated their duties by withholding and/or misrepresenting material information in connection with the prosecution of the Asserted PMC Patents.  Upon

information and belief, such failure of disclosure and misrepresentations were done with an intent to deceive or mislead the PTO.

64.     The Asserted PMC Patents are unenforceable due to inequitable conduct before the PTO in connection with both:  (1) the applications that issued as the Asserted PMC Patents, and (2) the applications that were filed after the applications that issued as the Asserted PMC Patents.  Actions by the Harvey applicants during prosecution of these later applications were sufficient to cause the examiner to issue a communication that specifically states his belief that the actions of applicants were intended to deceive the PTO and that those actions harmed the public interest.  The actions with regard to the various applications in the Harvey portfolio render all of the patents in the portfolio unenforceable due to inequitable conduct and infectious unenforceability.

65.     On November 3, 1981, a patent application was filed on behalf of John C. Harvey and James W. Cuddihy ("applicants").  That application was assigned Serial No. 06/317,510 (the "1981 application"), and it ultimately issued as the '490 patent on September 15, 1987.  The '510 application was 44 pages of text.

66.     On February 14, 1986, applicants filed a continuation application that was assigned Serial No. 06/829,531.  This application ultimately issued as the '725 patent on November 3, 1987.  The '531 application was based on the original 44-page specification filed as part of the 1981 application.

67.     On September 11, 1987, applicants filed a continuation-in-part application that was assigned Serial No. 07/096,096 (the "1987 application").  This application ultimately issued as the '825 patent on November 23, 1990.  The '096 continuation-in-part application was 557 pages of text, and it deleted most of the material that was contained in the original 44-page 1981 application.  The 1987 application did *not* incorporate by reference any part of the 1981 application.  Indeed, the 1981 and 1987 applications largely describe different subject matter. Nevertheless, applicants did *not* notify the PTO that there was virtually no common subject matter between the 1981 and 1987 applications.  Because the 1987 application was more than

550 pages, it would have been exceedingly difficult for an examiner to determine what information was common to the 1981 and 1987 applications.  On information and belief, applicants failed to disclose these highly material facts regarding the 1987 application during prosecution of the '825, '414, '654, '277, and '243 patents in order to deceive the PTO into thinking that the claims based on the 1987 application were supported by the 1981 application.

68.     On September 25, 1990, applicants filed an application that was assigned Serial No. 07/588,126.  This application ultimately issued as the '414 patent on April 28, 1992.  The '414 patent is based on the 557-page 1987 application.  The '126 application did not incorporate by reference any part of the original 44-page application that was filed in 1981.

69.     On March 10, 1992, applicants filed an application that was assigned Serial No. 08/849,226.  This application ultimately issued as the '654 patent on August 3, 1993.  The '654 patent is based on the 557-page 1987 application.  The '226 application did not incorporate by reference any part of the original 44-page application that was filed in 1981.

70.     On May 3, 1993, applicants filed an application that was assigned Serial No. 08/056,501.  This application ultimately issued as the '277 patent on August 2, 1994.  The '277 patent is based on the 557-page 1987 application.  The '501 application did not incorporate by reference any part of the original 44-page application that was filed in 1981.

71.     On June 7, 1995, applicants filed an application that was assigned Serial No. 08/480,060.  This application ultimately issued as the '243 patent on March 23, 1999.  The '243 patent is based on the 557-page 1987 application.  The '060 application did not incorporate by reference any part of the original 44-page application that was filed in 1981.

72.     Applicants also pursued international patent rights.  On August 9, 1988, applicants filed a PCT Application (PCT/US88/0300) claiming priority to the 557-page application that was first filed in 1987 (and that ultimately issued as the '825 patent).  The PCT did *not* claim priority to the 44-page application filed in 1981.  The PCT application was published on August 22, 1990 (W0 89/102682), and it states that the "priority date" is "11 September 1987."  The published claims of the PCT application are very similar to the claims

that were pursued and later issued as the '825 patent in the United States.  Thus, statements made in Europe regarding the priority of the PCT claims were highly material to the examination of the claims in the United States.

73.     On information and belief, PMC did not claim the benefit of the 1981 application in Europe because doing so would have had adverse consequences to patentability in that jurisdiction.  Specifically, if the 1981 application disclosed the claims of the PCT, the 1981 application would have rendered the PCT claims unpatentable because the PCT was filed more than a year after the 1981 application.  In other words, to stand a chance of obtaining a patent in Europe, applicants had to argue that the U.S. application that first supported the European claims was the 557-page 1987 application, *not* the 44-page 1981 application.  This argument is exactly the opposite of what applicants have consistently and aggressively argued to the PTO in the United States.

74.     Applicants did *not* cite the PCT's priority claim only to the 1987 application during prosecution of the applications that issued as the '825, '654, '277, and '243 patents.

75.     On information and belief, applicants were aware of the priority claims of the PCT by virtue of their being named inventors on the PCT application.  On information and belief, applicants' United States patent counsel was aware of the priority claims of the PCT by virtue of being patent prosecution counsel for applicants.  Indeed, in litigation filed by Personalized Mass Media Corp. ("PMMC"), a predecessor-in-interest to PMC, asserting some of the same Harvey patents in the Eastern District of Virginia, the Court noted that Thomas Scott, Jr. (applicants' U.S. patent counsel) was deeply involved in PMC's patent prosecution efforts both in the United States and abroad during the relevant timeframe.  The Court cited "literature prepared by PMMC for use in raising capital," which stated:

> [Mr. Scott] has advised John Harvey about the filing and prosecuting of the Company's patent position since the late 1970's. He is the expert on all aspects of the Company's patent position: including the disclosures on file in the U.S. Patent and Trademark Office, the disclosures associated with the Company's patent applications in Europe, Japan and elsewhere and the Company's development of its future patent prosecution strategy.

*Personalized Mass Media Corp. v. The Weather Channel, et al.*, 899 F. Supp. 239, 241-42 (E.D. Va. 1995).

76.     On information and belief, applicants and/or applicants' counsel deliberately failed to disclose the priority claim made in the PCT in order to argue exactly the opposite in the United States, namely that the 1981 application supported the later claims that were prosecuted based on the 1987 application.  In other words, applicants and/or applicants' counsel concealed the fact that fundamentally inconsistent arguments were being made as to the priority of similar claims based on identical specifications in different jurisdictions.

77.     There were at least five oppositions filed against the PMC European patent in the European Patent Office.  These oppositions were filed no later than March 3, 1998.  PMC filed a response to these oppositions on January 8, 1999.  In that response, applicants argued that the 1987 application contained "improvements" to the 1981 application and that the claims of the European patent were directed to those "improvements."  PMC argued that each claim contained "at least one essential element of the additional subject matter" found in the 1987 application but *not* the 1981 application.  None of the five oppositions were provided to the PTO during the then-ongoing prosecution of the '243 patent application.  PMC's response to the oppositions was also not disclosed to the PTO.  On information and belief, these materials were not submitted to the PTO during the prosecution of other Harvey patent applications.  The arguments made in the European oppositions and the arguments made in response by PMC were highly relevant to the pending claims in the United States.

78.     On information and belief, these omissions were done with an intent to deceive the PTO as to the priority of the claims that issued in the '825, '414, '654, '277, and '243 patents.  As there are numerous highly relevant prior art references that are dated between the 1981 and 1987 applications, the priority claims were highly material to the prosecution of each of these patents.  Moreover, priority for the claims based on the 1987 specification has been repeatedly raised as an issue during prosecution or reexamination of many of the patents or patent applications in the Harvey portfolio and surely would have been raised in many more if

applicants had disclosed their fundamentally inconsistent position in Europe and other foreign jurisdictions.  These actions constitute inequitable conduct that renders these patents unenforceable and/or additional patents and patent applications in the Harvey portfolio unenforceable.

79.     On information and belief, during prosecution of the application that led to the '243 patent, applicants also intentionally failed to inform the PTO of litigation related to the Harvey patents.  The M.P.E.P. states that "[w]here the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the Patent and Trademark Office."  § 2001.06(c) (6th ed., Jan. 1995).  The litigation involving the Harvey patents was highly relevant to the prosecution of the pending applications.

80.     On March 9, 1995, PMMC filed a lawsuit against The Weather Channel and multiple cable television companies in the U.S. District Court for the Eastern District of Virginia. *PMMC v. Weather Channel, Inc.*, *et al.*, Civil Action No. 95-cv-00242 (REP) (E.D. Va. 1995). On November 13, 1996, PMC filed suit against Thomson Consumer Electronics, Hughes Network Systems, Hitachi Home Electronics, Toshiba America Consumer Products, Matsushita Electric Corporation of America, DIRECTV, Inc., and United States Satellite Broadcasting in the U.S. District Court for the Northern District of California.  *PMC v. Thomson Consumer Elecs., et al.*, Civil Action No. 96-cv-20957 (SW) (N.D. Cal. 1996).  PMC also initiated an investigation in the U.S. International Trade Commission against the same defendants accused of infringement in the Northern District of California action.  *In the Matter of Certain Digital Satellite System (DSS) Receivers and Components Thereof*, Inv. No. 337-TA-392 (ITC 1996).  Each of these actions involved one or more of the Harvey patents.

81.     On June 7, 1995, applicants filed a continuation application that ultimately issued as the '243 patent on March 23, 1999.  Upon information and belief, during prosecution of the application resulting in the '243 patent, the applicants, through their patent attorney, intentionally failed to disclose relevant information regarding these three cases to the PTO, despite having

actual knowledge of the cases and despite the fact that litigation was ongoing during prosecution of the application leading to the '243 patent.  On information and belief, applicants' failure to disclose relevant facts regarding one or more of these cases involving the Harvey patents was deliberate and was intended to deceive the PTO.  Applicants' failure to disclose such information constitutes inequitable conduct that renders the '243 patent and/or additional patents and patent applications in the Harvey portfolio unenforceable.

82.     In the United States, applicants also submitted huge numbers of references within which highly relevant references were effectively buried.  For example, during prosecution of the '277 patent, over 200 references were submitted to the examiner.  During prosecution of the '243 patent, well over a 1000 references were submitted to the examiner.  Some of these references were unquestionably irrelevant.  As examples of these numerous irrelevant citations, the face of the '243 patent cites U.S. Patent No. 33,186 (Dougal *et al*.), a patent that issued in 1861 and is entitled "Improvement in Bee-Hives"; U.S. Patent No. 2,731,197 (Parker *et al*.), a patent that issued in 1956 and is directed to an improved "stop pin box" used to control "calculator actuators" in accounting machines; and U.S. Patent No. 4,473,068 (Oh), a patent that issued in 1982 and is directed to an improved implant "for use in retention of the greater trochanter" in hip replacements.

83.     Moreover, these massive disclosures contained highly relevant references, but applicants did not bring particularly material references to the attention of the examiner.  For example, during prosecution of the '277 patent, applicants submitted a "supplemental" information disclosure statement dated November 4, 1993.  That statement included approximately 175 references, including U.S. and foreign patents and several articles.  In what was alleged to be an effort to "assist" the examiner, applicants later submitted a bewildering chart that supposedly categorized the references into approximately 20 non-exclusive "groups" and purported to identify which "groups" were relevant to the pending claims.  In addition to the fact that the rationale for the "groups" was not disclosed, the groups were unwieldy.  For example, "Group A" alone contains approximately 50 references.  And, one of the "groups" was

named "Other Patents Unclassified by Group."  Within this mass disclosure were several key references, including:  U.S. Patent Nos. 3,886,302 (Kosco), 4115,662 (Gulnet *et al*.), 4,186,413 (Mortimer), 4,295,223 (Shutterly), 4,305,101 (Yarbrough *et al*.), 4,323,922 (den Toonder *et al*.), 4,390,901 (Keiser), and 4,488,179 (Kruger *et al*.).  Applicants did not describe the disclosure of *any* of these references.  Each of these references was later found by the PTO to raise a substantial new question of patentability as to one or more of the claims of the '277 patent in reexamination proceedings.  The amount of information presented to the examiner during prosecution of the Harvey applications was exacerbated by the fact that the applications that led to the '825, '414, '654, '277, and '243 patents were hundreds of pages long.  On information and belief, applicants deliberately buried highly relevant references in an effort to thwart proper examination of the claims and did so intending to deceive the PTO.

84.    Additionally, during prosecution of the '825 patent, applicants submitted a "Supplemental Information Disclosure Statement" *after* allowance of certain claims.  Applicants stated:

> Applicants do not consider the references listed on the Form PTO-1449 to be material to or to affect the patentability of the allowed claims in the application.  The references came to applicants' attention in the period since the submission of the January 29, 1990 Amendment.  Applicants realize that, under MPEP Section 609, the examiner is not required to consider the cited references.  Applicants do not consider any action by the examiner necessary.  The new references are cited solely to complete the record before the Patent and Trademark Office (PTO).

Among the supposedly immaterial references was U.S. Patent No. 4,488,179 to Kruger *et al*.  As to this reference, applicants stated:  "The Kruger system … does not impact the patentability of the claims as allowed."  However, during reexamination of the '825 patent, the PTO determined: "It is agreed that the consideration of U.S. Patent No. 4,488,179 to Kruger *et al*. raises a substantial new question of patentability as to claim 14 of the instant Harvey *et al*. patent."  The examiner further stated:  "The Kruger *et al*. reference is not cumulative with respect to the prior art of record cited in the patented file.  There is a substantial likelihood that a reasonable

examiner would consider the teachings of Kruger *et al.* important in deciding whether or not claim 14 of Harvey et al. [#4,965,825] is patentable." On information and belief, applicants belatedly disclosed and deliberately mischaracterized the Kruger *et al.* reference in an effort to deceive the PTO to obtain claims that were not in fact patentable. (The Kruger *et al.* patent was not ultimately considered by the examiner during prosecution of the '825 patent.)

85.    The 557-page continuation-in-part application that was filed in 1987 and that led to the '825, '654, '277, and '243 patents is unnecessarily long and written in ponderous prose. On information and belief, this massive specification was submitted to overwhelm the examiner and preclude effective review of the applications by the PTO. As an example, due to the unnecessary length of the 1987 application, it is exceedingly difficult to accurately assess issues such as written description and enablement. Additionally, the length of the specification makes it very difficult to determine what subject matter is common to the 1981 and 1987 applications.

86.    Moreover, applicants submitted unnecessarily numerous claims during prosecution of the Harvey applications. For example, during prosecution of the claims that ultimately issued as the '825 patent, the examiner objected to the 100+ claims on indefiniteness grounds: "Taken as a whole the claims recite an undue multiplicity which by virtue of the unreasonable number of claims presented tends to obfuscate and confuse the claimed invention." During prosecution of one of the Harvey patent applications, the examiner noted that in the 300+ pending applications, "it is estimated that there may be between 10,000 and 20,000 claims." On information and belief, the numerous claims were submitted to overwhelm the examiner and to preclude effective review of the applications by the PTO. The burden on the PTO was exacerbated by the number of references submitted by applicants during prosecution and the lengthy 1987 specification. On information and belief, these actions were undertaken with an intent to deceive the PTO into allowing claims that were not actually patentable.

87.    Applicants also failed to comply with the relevant rules and regulations regarding payment of fees as a small or large entity. Such failure constitutes fraud on the PTO. The M.P.E.P. states that "[s]mall entity status must not be established unless the person or persons

signing the verified statement can unequivocally make the required self-certification."  § 509.03

(6th ed., Jan. 1995).  The duty is ongoing and must be made upon the occurrence of certain

events, including the payment of maintenance fees.  37 C.F.R. § 1.28(b) (1995) ("Notification of

any change in status resulting in loss of entitlement to small entity status must be filed in the

application or patent prior to paying, or at the time of paying, the earliest of the issue fee or any

maintenance fee due after the date on which status as a small entity is no longer appropriate.").

"[A]ny attempt to improperly establish status as a small entity will be viewed as a serious matter

by the [PTO]."  M.P.E.P. § 509.03 (6th ed., Jan. 1995).  The PTO does not normally question

claims to entitlement to small entity status, but improper claiming of such status may be

considered to be fraud on the PTO.  37 C.F.R. §1.28(d)(2) (1995) ("Improperly and with intent to

deceive (i) Establishing status as a small entity, or (ii) Paying fees as a small entity shall be

considered as a fraud practiced or attempted on the Office.").

88.    It is clear that the applicants had actual knowledge that claiming small entity

status for the Harvey patent applications was inappropriate by December 1994, at the latest.  In

January 1995, after allowance of the claims of the '277 patent, a document entitled "Notification

of Change in Status Under 27 C.F.R. § 1.28(b) and Payment of Issue Fee Deficiency Under 37

C.F.R. § 1.28(c)" was submitted by applicants.  That submission stated (emphasis added):

> Pursuant to 37 C.F.R. § 1.28(c), Attorneys for Applicants hereby
> provide notification that Personalized Mass Media Corporation
> ("PMMC"), the assignee of U.S. Patent No. 5,335,277, no longer
> qualifies for small entity status under M.P.E.P. § 509.02 and 37
> C.F.R. § 1.9 for paying reduced patent fees for U.S. Patent No.
> 5,335,277.  *PMMC lost its entitlement to small entity status for
> U.S. Patent No. 5,335,277 in March, 1994 as a result of a license
> agreement with a large entity.*  Applicants and Attorneys for
> Applicants were unaware that PMMC lost its entitlement to small
> entity status in March, 1994 and inadvertently paid the reduced
> issue fee for U.S. Patent No. 5,355,277 on May 12, 1994 claiming
> small entity status.

A verified statement from applicants' counsel, Thomas Scott, Jr., was submitted in support of

this document.  It purported to explain "how the error in good faith occurred."  In the verified

statement, Mr. Scott stated that PMC was *not* actually entitled to small entity status as of March 1994, and that he did not realize that fact until December 1994.

89.     On information and belief, PMC also had licenses with other large entities by January 1996.  Any such agreements would have been relevant to the claiming of small entity status for the Harvey patents and patent applications as of the dates of the agreements.  On information and belief, PMMC and Sony entered into a license agreement on October 31, 1995, and PMMC and The Weather Channel entered into a license agreement on January 31, 1996.

90.     Nevertheless, applicants failed to pay the proper maintenance fees for the '490, '725, '825, '414, and '654 patents.  For example, for the '825 patent applicants paid small entity rates for the four-year maintenance fee (in 1994) and for the eight-year maintenance fee (in 1998).  Small entity status was also improperly claimed in 1995 and 1999 for the '490 patent, in 1995 and 1999 for the '725 patent, in 1995 and 1999 for the '414 patent, and in 1997 for the '654 patent.

91.     Thus, over a period of several years, applicants repeatedly and improperly claimed small entity status despite having actual knowledge that such claims were improper. Moreover, applicants improperly claimed small entity status for the application (filed June 7, 1995) that ultimately issued as the '243 patent.  Applicants also improperly claimed small entity status for pending application 08/466,894, filed on June 6, 1995.  On information and belief, applicants also improperly claimed small entity status for many other Harvey patent applications filed in 1995.

92.     In May and June 2000 — years after small entity status was improperly claimed and the small entity fees were paid on the '490, '725, '825, '414, '243, and '654 patents — applicants belatedly claimed that their status as a small entity "has been changed" and that small entity fees were inappropriate.  Applicants filed a "Notification of Change of Status and Payment of Additional Maintenance Fee" for these issued patents, and those submissions were accepted by the PTO.  However, in these submissions, applicants did *not* indicate to the PTO that the supposed error had been discovered approximately five years earlier, in late 1994, or that they

had previously filed a verified statement regarding the supposed errors.  Applicants also did not

provide an explanation for the repeated small entity status errors or explain why they did not

correct the errors years earlier.

93.     Applicants had a affirmative duty to investigate the propriety of the small entity

claims each time a maintenance fee was paid (and each time a patent application was filed), and

applicants knew that such claims were improper at least as early as late 1994.  On information

and belief, applicants concealed the true facts regarding the improper claims to small entity

status in order to mislead the PTO into concluding that the errors were made in good faith and

could therefore be excused under 37 C.F.R. § 1.28(c) (1995).  On information and belief, the

small entity fees paid from 1994 to 2000 were not established in good faith, nor were they paid

in good faith.  This pattern of improperly claiming small entity status constitutes fraud on the

PTO.  (Additionally, as described below, this pattern continued during prosecution of the

hundreds of applications filed in 1995.)

94.     Between March 2, 1995 and June 7, 1995, in an apparent effort to beat the GATT

amendments in 1995 that provided for a 20-year term from the filing of the first application

(rather than 17 years from issuance of the patent), PMC filed more than 300 applications in the

PTO.  Many of those applications were later abandoned.  PMC's actions during prosecution of

these applications caused the examiner to issue a remarkable communication.  In the 38-page

document, the examiner stated that applicants had engaged in a systematic strategy to mislead

and overwhelm the PTO, and did so intending to deceive the PTO.  The communication was

filed in several applications, including Serial No. 08/113,329 on January 26, 2001, and it

describes a broad pattern of conduct in which the applicants engaged for many years.  A copy of

the document is attached as Exhibit A.

95.     In the communication, the examiner stated:  "Applicants and their counsel

(Thomas Scott, Jr.) have been attempting to secure patents by pursuing their unique, but

improper, prosecution strategy for many years….  Applicants' prosecution 'strategy' has

involved the submission of tens of thousands of claims, as well as thousands [of] prior art

references, a substantial number of which are irrelevant." (*Id*. at 3 (quotation omitted).)  The Examiner stated that the files of the various Harvey patents "are replete with a pattern of material misrepresentations of law and related factual omission.  As a consequence, the portfolio prosecution record adds up to a virtually meaningless record as to the merits and thus, among other things, has caused unjustifiable and prejudicial delay." (*Id*. at 7.)  The examiner stated his belief that these actions were not unintentional:  "For the purpose of protecting the public interest, the primary examiner states for the record that he firmly believes it was the principal counsel's intent to mislead the U.S.P.T.O." (*Id*. at 15.)

96.     As to the priority issue, the examiner stated that applicants knew or should have known that "continuity of disclosure" was required for a claim to be entitled to the filing date of an earlier application. (*Id*. at 11.)  The examiner noted that the Administrative Law Judge in an ITC action involving the same patents "reproached applicants for improperly identifying written description from the 1981 44-page parent specification" and that they received judicial notice that "the written description for applicants' claims is necessarily found in the 1987 557-page specification not the 1981 44-page specification." (*Id*. at 12.)  The examiner stated that the applicants' arguments regarding priority "do not appear to be *bona-fide*" and that applicants' submissions "misstate the legal test" for priority. (*Id*. at 13.)  Moreover, "the primary examiner and other U.S.P.T.O. examiners have relied in good faith" on applicants' misstatements and omissions. (*Id*. at 14.)  The examiner stated that applicants engaged in "a blatant attempt to obtain literal patent coverage claiming priority to 1981 for something that they did not have in their possession as of the 1981 filing date." (*Id*. at 30.)  These acts, and others, "caused unjustifiable and prejudicial delay" and are "grounds for rejections of the claim on the basis of laches." (*Id*. at 14.)

97.     As to the extraordinary number of claims presented during prosecution, the examiner noted that a "conservative" estimate is that applicants presented "between 18 and 36 claims per page of the 1987 description; i.e., about one claim for every 8.5 to 17.7 words." (*Id*.

at 19.)  The examiner concluded:  "The number of claims filed by applicants has caused unjustifiable and prejudicial delay."  (*Id*.)

98.     As to the extraordinary number of references cited by applicants during prosecution, the examiner noted that during prosecution of the application then under consideration, "applicants have filed approximately 2,200 references, many of which are irrelevant."  (*Id*. at 20.)  The examiner stated that some foreign references were not accompanied by statements of relevance or translations and were therefore in violation of PTO rules.  Among the irrelevant references were a patent to a beehive and business cards.  (*Id*.)  The examiner concluded:  "These, among other references, create an onerous burden on the U.S.P.T.O. and have caused unjustifiable and prejudicial delay."  (*Id*.)

99.     As to the small entity issue, the examiner noted that applicants had simultaneously claimed small and large entity status for similar subject matter.  (*Id*. at 31-36.)  The examiner noted that the PTO had requested an explanation for the varying payments, but had not received one.  (*Id*. at 31.)  The examiner stated that there did not appear to be a difference in the subject matter of the varying claims to small or large entity status and that entity status was inconsistently claimed even within applicants' subject matter groupings.  The examiner noted that applicants' counsel had discussed the small/large entity issue with the PTO "at least as early as August 13, 1995."  (*Id*. at 34.)  The examiner observed that applicants changed the claimed entity status even within the same application.  (*Id*.)

100.    The examiner noted that applicants seemed to have tried to justify the inconsistent claims of small/large entity status on a "field of use" clause in a license agreement.  The examiner stated:

> However, over the duration of many months, applicants' "strategy"
> has included a pattern of changing one or another of the portfolio's
> 329 applications to and from small and large entity.  Further, the
> portfolio fee payment record reflects applicants' counsels signing
> both small and large fee transmittal letters for the portfolio, on the
> same day.  The fact that the same counsel would sign apparently
> contradictory fee transmittal letters for both of applicants'

portfolios' large and small inventions, claiming the same subject
matter, does not appear to be inadvertent.

(*Id*. at 35.)  The examiner also noted that applicants paid a number of deficient fees in 2000,
despite the fact that applicants' counsel was made aware of the issue in a personal interview with
a PTO examiner years earlier.  (*Id*. at 36.)

101.   The examiner also noted other issues, including applicants' untimely preliminary
submissions (*id*. at 20), applicants' filing of substantially duplicate claims in different
applications (*id*. at 20-21), failure to alert examiners handling different Harvey applications of
prior art rejections of the same or similar claims in other applications (*id*. at 21), attempting to
obtain different interpretations of prior art references from different examiners (*id*. at 24), failing
to alert examiners to conflicts between applications directed to the same subject matter but
assigned to different examiners (*id*. at 24-25), and applicants failure to comply with an
agreement with the PTO to consolidate the many Harvey applications into fewer applications (*id*.
at 31).

102.   Applicants filed a response to the communication.  The PTO later determined that
the statements in the communication were not related to patentability of the subject matter
claimed in the then-pending applications and, therefore, the communication was withdrawn (in
some or all of the then-pending Harvey cases) on procedural grounds.  The PTO did not state that
any of the facts contained in the communication were inaccurate.

103.   As a result of the huge 1987 application, enormous number of cited references,
thousands of claims, and hundreds of applications, the examiners were likely forced to rely to a
greater extent than usual on the disclosures and representations of applicants and applicants'
counsel.  And, as described herein, those disclosures and representations were incomplete and
misleading.

104.   These actions relating to the Harvey patents and patent applications have occurred
over a period of many years and evidence a systematic and improper strategy of prosecution.
These actions are material to patentability, particularly given the enormous length of the 1987

application and huge number of cited references.  On information and belief, these actions were

part of a deliberate plan designed to overwhelm and mislead the PTO and were done with an

intent to mislead the PTO.  The actions with regard to the applications in the Harvey portfolio

render all of the patents in the portfolio unenforceable due to inequitable conduct.

**Twelfth Affirmative Defense**
**(Unclean Hands)**

105.    Each of PMC's claims for relief is barred, in whole or in part, by the doctrine of

unclean hands.

**COUNTERCLAIMS**

**(Declaratory Judgment of Invalidity, Non-Infringement, and**
**Unenforceability of the Asserted PMC Patents)**

Pursuant to Federal Rule of Civil Procedure 13, Counterclaimants EchoStar Corp. and

DISH Network Corp. (collectively the "EchoStar Counterclaimants") allege the following

counterclaim against Counterclaim Defendant Personalized Media Communications LLC

("PMC"):

1.    The EchoStar Counterclaimants incorporate the allegations of their Answer as if

set forth herein.

2.    This is an action arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201

and 2202, and under the United States Patent Act, 35 U.S.C. § 1, *et seq*.  The EchoStar

Counterclaimants request a judicial declaration that (1) they do not infringe any valid,

enforceable claim of U.S. Patent Nos. 4,694,490; 4,965,825; 5,109,414; 5,233,654; 5,335,277;

and 5,887,243 (the "Asserted PMC Patents") and (2) the Asserted PMC Patents are invalid and

unenforceable.

3.    EchoStar Corp. is a Nevada corporation with a principal place of business at 90

Inverness Circle East, Englewood, CO 80112.

4.    DISH Network Corp. is a Nevada corporation with a principal place of business at

9601 S. Meridian Blvd., Englewood, CO 80112.

5.      On information and belief, PMC is a Delaware corporation with its principal place of business at 708 3rd Ave., 35th Floor, New York, NY  10017.

6.      PMC purports to be the assignee of the Asserted PMC Patents and to have the rights to sue and recover for infringement of the PMC patents.

7.      By its Complaint, PMC alleges that the Asserted PMC Patents are valid and enforceable and that the EchoStar Counterclaimants have infringed the Asserted PMC Patents. The EchoStar Counterclaimants have denied these allegations.  The EchoStar Counterclaimants contend that they do not infringe the Asserted PMC Patents and that the Asserted PMC Patents are invalid and unenforceable.  An immediate, real, and justiciable controversy therefore exists between the EchoStar Counterclaimants and PMC.

8.       By this counterclaim, the EchoStar Counterclaimants seek a declaratory judgment that the Asserted PMC Patents are invalid, unenforceable, and not infringed by the EchoStar Counterclaimants.

9.      This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 1367(a), 2201, 2202, and 35 U.S.C. § 1 *et seq.*

10.     This judicial district is one of several where venue lies over the EchoStar Counterclaimants' claims for declaratory relief because PMC is subject to personal jurisdiction in this Court, having, for example, instituted litigation in this Court and otherwise having carried on substantial business activities within this District and this Division.  Venue would therefore be proper pursuant to 28 U.S.C. § 1391(c).

11.     The EchoStar Counterclaimants request a declaratory judgment that they have not and do not infringe, either literally or under the doctrine of equivalents, directly, by inducement, contributorily, or in any way, any valid and enforceable claim of the Asserted PMC Patents and/or that the claims of the Asserted PMC Patents are invalid and unenforceable.

12.     A judicial declaration is necessary and appropriate at this time in order that the EchoStar Counterclaimants may ascertain their rights and duties with respect to the Asserted PMC Patents.

## COUNT ONE
### (Declaratory Judgment of Non-Infringement of the Asserted PMC Patents)

13.     The EchoStar Counterclaimants do not infringe, have not infringed, and do not and have not induced infringement or contributed to infringement of any valid, enforceable claim of the Asserted PMC Patents under any theory, including literal infringement or infringement under the doctrine of equivalents.

14.     Additionally, PMC is precluded under the doctrine of prosecution history estoppel from asserting or construing, whether literally or by the doctrine of equivalents, the claims of the Asserted PMC Patents in a way that would cover or read upon any product made, used, sold, or offered for sale by the EchoStar Counterclaimants.

## COUNT TWO
### (Declaratory Judgment of Invalidity of the Asserted PMC Patents)

15.     The EchoStar Counterclaimants further allege that the Asserted PMC Patents are invalid under one or more sections of Title 35 of the U.S. Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112, *et al.*

## COUNT THREE
### (Declaratory Judgment of Unenforceability of the Asserted PMC Patents)

16.     The Asserted PMC Patents are unenforceable under the doctrines of laches, waiver, equitable estoppel, prosecution history estoppel, and unclean hands.

17.     As set forth above in the EchoStar Counterclaimants' Answer to PMC's complaint, which the EchoStar Counterclaimants' have expressly incorporated by reference, the Asserted PMC Patents are also unenforceable because they were obtained through inequitable conduct before the United States Patent and Trademark Office in that PMC, PMC's predecessors-in-interest, the applicants, and/or the inventors, or any of their agents, intended to deceive or mislead the PTO by withholding and misrepresenting material information in violation of applicable law.

## ECHOSTAR'S PRAYER FOR RELIEF

WHEREFORE, EchoStar Corp. and DISH Network Corp. respectfully request that this Court enter judgment in their favor and against PMC and grant the following relief:

A.      Dismissal of PMC's claims in their entirety and with prejudice;

B.      Entry of judgment in favor of EchoStar Corp. and DISH Network Corp. and against PMC on all claims in PMC's complaint;

C.      A declaration that EchoStar Corp. and DISH Network Corp. do not infringe, contribute to infringement of, or induce infringement of any valid and enforceable claim of the Asserted PMC Patents;

D.      A declaration that all of the claims of the Asserted PMC Patents are invalid;

E.      A declaration that all of the claims of the Asserted PMC Patents are unenforceable;

F.      A declaration that PMC take nothing by way of its complaint;

G.      An order awarding EchoStar Corp. and DISH Network their costs pursuant to 35 U.S.C. § 284;

H.      An order finding that this is an exceptional case and awarding EchoStar Corp. and DISH Network their reasonable attorney fees pursuant to 35 U.S.C. § 285; and

I.      An order awarding such other relief as the Court may deem appropriate under the circumstances.

## DEMAND FOR A JURY TRIAL

EchoStar Corp. and DISH Network hereby respectfully request a trial by jury on all issues triable as of right by a jury in this action.


Dated:  June 2, 2008                                    Respectively submitted,

                                                By:     _/s/ Rachel Krevans_____
                                                        Rachel Krevans
                                                        RKrevans@mofo.com
                                                        Jason A. Crotty (*pro hac vice*)
                                                        JCrotty@mofo.com
                                                        David M. Hymas (*pro hac vice*)
                                                        DHymas@mofo.com
                                                        MORRISON & FOERSTER LLP
                                                        425 Market St.
                                                        San Francisco, CA 94105-2482
                                                        Telephone: (415) 268-7000
                                                        Facsimile: (415) 268-7522


Otis Carroll
Attorney-in-Charge
State Bar No. 3895700
Deborah J. Race
State Bar No. 16448700
Ireland, Carroll & Kelley, PC
6101 S. Broadway, Suite 500
Tyler, TX 75703
Telephone:  (903) 561-1600
Facsimile:  (903) 561-1071
E-mail: Fedserv@icklaw.com

Attorneys for Defendants EchoStar Corp. and DISH Network Corp.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this motion was served on all counsel who have consented to electronic service on this the 2nd of June of 2008. Local Rule CV-5(a)(3)(A).

By:     */s/ Rachel Krevans*
        Rachel Krevans