**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| PERSONALIZED MEDIA COMMUNICATIONS, L.L.C., <br><br>                      Plaintiff, <br><br> v. <br><br> MOTOROLA, INC., ECHOSTAR CORP., AND DISH NETWORK CORP. f/k/a ECHOSTAR COMMUNICATIONS CORP., <br><br>                      Defendants. | Case No. 2:08-CV-00070 [CE] <br><br> JURY TRIAL DEMANDED |

## GEMSTAR'S THIRD-PARTY COMPLAINT

Third-Party Plaintiffs Rovi Guides, Inc. f/k/a Gemstar-TV Guide International, Inc., and TVG-PMC, Inc. (collectively "Gemstar") hereby assert claims against Plaintiff/Third-Party Defendant Personalized Media Communications, LLC as follows:

## PARTIES

1.

Third-Party Plaintiff Gemstar-TV Guide International, Inc. is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 2830 De La Cruz Blvd., Santa Clara, California 95050.

2.

Third-Party Plaintiff TVG-PMC, Inc. is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 2830 De La Cruz Blvd., Santa Clara, California 95050.

3.

On information and belief, Plaintiff/Third-Party Defendant Personalized Media Communications, LLC ("PMC") is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business at 708 3rd Avenue, 35th Floor, New York, New York 10017.

## JURISDICTION AND VENUE

4.

PMC has submitted itself to the jurisdiction of this Court by filing the above-styled action.

5.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338 and 1367, the Federal Declaratory Judgment Act (28 U.S.C. § 2201), and principles of ancillary and supplemental jurisdiction.

6.

Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400.

## FACTS

7.

StarSight Telecast, Inc. ("StarSight") was a company that provided products and services in the interactive television industry.

8.

StarSight's products included an interactive program guide service, a box (*i.e.*, a stand alone receiver box) which implemented the guide service, and related technology.

9.

An interactive program guide allows consumers (typically through on-screen menus) to navigate and access cable services, including selecting and viewing channels, obtaining program schedule information, and ordering services such as Pay-Per-View and Video-On-Demand.

10.

In conjunction with the StarSight guide, the StarSight box allowed a consumer to tune and watch programming by decoding incoming video.

11.

PMC is a four-person litigation and licensing company which owns a patent portfolio known as the Harvey Patents.

12.

The Harvey Patents include: U.S. Pat. Nos. 4,694,490 (the "490 Patent"); 4,704,725 (the "725 Patent"); 4,965,825 (the "825 Patent"); 5,233,654 (the "654 Patent"); 5,109,414 (the "414 Patent"); 5,335,277 (the "277 Patent"); and 5,887,243 (the "243 Patent").

13.

PMC's business consists of licensing rights to practice technology disclosed in the Harvey Patents and asserting patent infringement claims against companies who reject its licensing overtures.

14.

PMC contends that the Harvey Patents have broad application and have targeted numerous companies in various businesses, including areas other than television.

15.

PMC has never produced or distributed any products.

16.

In 1994, StarSight entered an agreement with PMC entitled "Patent License Agreement for StarSight" ("StarSight License"), pursuant to which StarSight obtained certain exclusive rights to practice technology disclosed in the Harvey Patents related to interactive program guides in a Field of Use termed "the field of Navigation and Navigation information practiced in the Defined Markets by means of Defined Delivery Systems."

17.

StarSight's guide and the box that implemented it and enabled its functionality provided a number of features, including one touch recording.

18.

One touch recording allowed a consumer to record television programs via the remote.

19.

In 1995, a dispute arose between PMC and StarSight as to the scope of the StarSight License.

20.

PMC claimed that the StarSight License's IPG (Interactive Program Guide) Field of Use was narrow in scope, limited to single functions related to navigation within certain screens, and did not include numerous guide related functions and features such as one touch recording.

21.

Although there were discussions between PMC and StarSight about amending their agreement to resolve their differences, PMC and StarSight never entered into such an amendment.  PMC subsequently initiated an action against StarSight for breach of the StarSight License.

22.

Gemstar International Group Limited ("Gemstar International") was another company that provided interactive program guide services and products.

23.

In or around 1997, Gemstar International acquired StarSight ("Gemstar-StarSight").

24.

In 1998, PMC approached United Video to discuss United Video obtaining a license to an IPG Field of Use.

25.

United Video was a diverse telecommunications company which was in the interactive program guide business.

26.

As of 1998, PMC knew that interactive program guides performed many functions other than merely providing a display of channel listings and descriptive information for television programming.

27.

In 1998, PMC's own internal analysis, which was prepared by a consultant engaged by PMC to investigate potential licensing opportunities, showed that interactive program guides performed a number of functions other than providing listings of descriptive programming information.  The 1998 memorandum states that interactive program guides include the following functions:

- Detecting and storing digital signal information;

- Time controlled tuning for delayed video taping;

- Descrambling authorized premium and Pay-Per-View programming;

- Controlling the technique and operation of a descrambler;

- Processing or modifying TV programming based on viewer input;

- Transmitting and controlling software downloads;

- Controlling the storing and application of downloaded software;

- Locating and processing dynamically allocated signals;

- Downloading software and reprogramming processors;

- Detecting and assembling non-programming digital signals; and

- Remote configuration of individual set-top boxes.

28.

In the fall of 1998, PMC provided to United Video a copy of a portion of the StarSight License which set forth the Field of Use.  PMC told United Video that PMC would be willing to provide a license to United Video which covered a number of features and functions which were not covered by PMC's license with StarSight.  Among other things, PMC told United Video that the StarSight License did not cover impulse Pay-Per-View, purchasing, or selecting or initiating a transaction (*i.e.*, purchasing goods and services).

29.

United Video conducted due diligence including reviewing PMC's patents, patent applications and related information and obtaining information about PMC's dispute with StarSight.

30.

United Video and PMC did not reach an agreement, and discussions ended.

31.

TV Guide Networks ("TV Guide") was another company that was in the interactive television business, developed and marketed interactive program guide products and services, and was a competitor of StarSight and Gemstar.

32.

In early 1999, United Video acquired TV Guide, and United Video changed its name to TV Guide.

33.

In late 1999, TV Guide and Gemstar-StarSight announced their agreement to merge.

34.

In mid-2000, the merger was completed, and Gemstar was formed.

35.

In late 1999/early 2000, PMC and Gemstar re-started the discussions which had taken place between United Video and PMC.  In or around the early spring 2000, negotiations ensued towards reaching a number of agreements, including a license agreement related to interactive program guide technology.

36.

Because of the unresolved dispute between StarSight (now part of Gemstar) and PMC regarding the scope of the StarSight License, Gemstar told PMC that it wanted to avoid any similar dispute, and that Gemstar wanted its current and future business activities, including but not limited to its interactive program guide products and services, covered completely by exclusive licenses.

37.

Gemstar's business activities broadly covered the interactive television industry and included licensing to set top box manufacturers and others based on its patent portfolio, providing interactive program guide technology and related products, acquiring device developers (such as StarSight and VideoGuide) and pursuing opportunities related to the processes that enable consumers to view programming (such as conditional access).

38.

In addition to the StarSight guide, as of 2000, one of Gemstar's products was TV Guide Interactive, which is a software-based product that is implemented via set-top boxes to function and provide interactive television to consumers.

39.

TV Guide Interactive enables a consumer to have an interactive television experience whereby the consumer via a remote can obtain descriptive programming information, navigate a multitude of viewing options, and implement processes to control and obtain desired programming.

40.

In 2000, TV Guide Interactive, which had been commercially available since the mid-1990s, provided numerous features and functionality including listings, tuning, parental control, favorites, pay-per-view, flip, and browse.

41.

TV Guide Interactive was implemented via set-top boxes, including those known as the DCT 1000 and DCT 2000 ("DCT Boxes"), without which TV Guide Interactive could not provide any functionality.

42.

TV Guide Interactive drives the DCT boxes to enable consumers to obtain desired programming by initiating functions such as tuning, which involves filtering and decryption.

43.

The "tuning" function for digital set-top boxes such as the DCT boxes involves a number of processes, including packet filtering, decryption, and decoding.  The decryption process requires, among other things, the decryption of authorization and control data so that content can be decrypted, which is referred to as "conditional access."

44.

Interactive television technology is constantly evolving to provide consumers with additional features and functions.

45.

In 2000, Gemstar continued to develop TV Guide Interactive, including a substantial effort to develop a Video-On-Demand application, which eventually became part of TV Guide Interactive.

46.

In connection with the agreements that were eventually reached between PMC and Gemstar in December of 2000, the parties spent the most time negotiating the language of an exclusive interactive program guide ("IPG") license which was a license critical to Gemstar's business.

47.

At all relevant times, the parties understood that Gemstar wanted its current and future products and current and future business activities completely covered by exclusive licenses, and therefore, the IPG field would be broad and inclusive.

48.

On numerous occasions, when the parties were drafting language and exchanging drafts of the Field of Use language, PMC confirmed this understanding.

49.

For example, on May 4, 2000, PMC represented in writing that "TV Guide and PMC had developed a mutual understanding that the exclusive Fields of Use are intended to cover TV Guide's actual business activities and reasonable extensions thereof."

50.

On May 31, 2000, PMC represented in writing that it "wished to license any TV Guide product now in use or to be used in the foreseeable future."

51.

Because its interactive products and services provided more features and functions than simply providing displays of television listings and descriptive information and navigation from such displays, Gemstar rejected any approach tying the IPG License Field of Use to displays or limiting the scope of the license to features or functions accessed through certain displays.

52.

In addition to the licenses, the parties also negotiated an agreement whereby Gemstar would obtain an ownership interest in PMC.

53.

In June 2000, to enable PMC to execute an acknowledgement that certain of Gemstar's products and services were in fact included within the exclusive IPG Field of Use, Tom Scott, an attorney representing PMC in the transaction, went to a Gemstar facility in Tulsa, Oklahoma to inspect TV Guide Interactive.

54.

During the inspection, Mr. Scott met with Gemstar representatives, including a number of engineers, and, for several hours, inspected TV Guide Interactive which was running on a DCT 1000 set-top box.

55.

Gemstar and PMC intended that TV Guide Interactive be covered by the IPG License and within the exclusive IPG Field of Use.

56.

The IPG License was a critical part of the $65,000,000 transaction that enticed Gemstar to enter into the deal.  In October 2000, after being requested by Gemstar to provide confirmation as to the broad nature of the IPG license so that the necessary board approval for closing the $65,000,000 transaction could be obtained, PMC again represented to Gemstar in writing that the IPG license covered numerous program enhancement features which were not covered by the StarSight license, including one touch recording, parental control and Pay-Per-View.

57.

After months of negotiation, on or around December 29, 2000, Gemstar and PMC closed the multi-part transaction that included the Exclusive IPG License Agreement ("IPG License").

58.

Throughout the negotiations, which started in 1998 and led to the agreement entered into in December 2000, the Parties were represented by sophisticated counsel.

59.

The IPG License granted Gemstar exclusive rights to the inventions disclosed in the Harvey Patents within the IPG Field of Use, and the exclusive right to enforce such rights against any person operating in the IPG Field of Use.

60.

As to the Field of Use, Paragraph 1.3 of the IPG License provides:

The "Interactive Program Guide" field means applications and services (collectively "IPG Applications"), the primary purpose of which is to provide descriptive information (including without limitation program listings) relating to television or radio programming available to Consumers, and which may, or through actions by a Consumer may, control Consumer equipment that enables viewing, listening, recording or storing of such television or radio programming, but where such IPG applications are not primarily intended to provide descriptive information relating solely to advertising or promotional programming available to Consumers. Such IPG Applications shall include, without limitation, tuning, flip, browse, parental control, recording, reminders, favorites, searching or sorting listings by any category or criteria, video on demand, near video on demand, pay per view, picture in guide functionality, help, user profile setup, generation or use, TV mail, TV chat, and TV newsgroups. The Interactive Program Guide field shall also include the ability to access from such IPG Applications any other interactive or passive application, service or feature; provided, however, that the creation, distribution, transmission and use by a Consumer of such other interactive or passive applications, features or services or the television or radio programming accessible through such IPG Applications shall not be deemed to be included in the Interactive Program Guide field. The Interactive Program Guide field shall further include the ability to provide additional programming created or provided by TVG-PMC or any of its Affiliates that may be unrelated to the primary purpose of the Interactive Program Guide field, which additional programming is integral to and a part of the IPG Applications, and where the purpose of such additional programming is to be viewed or heard by a Consumer while using the IPG Applications. The Interactive Program Guide field shall further include any supplemental video, audio, text, graphics or multimedia, including but not limited to advertising or e-commerce opportunities of any kind, provided within the IPG Applications. The Interactive Program Guide field shall

- 12 -

further include the generation and transmission of information resulting from the use of the above functionality ("Backhaul Data"). The Interactive Program Guide field shall also include any device, portion of device, or process to the extent that it is used to implement the above functionality, which functionality may be provided via any Media.

(Attached hereto as Exhibit 1 is a true and correct copy of the IPG License.)

61.

In the IPG License, PMC promised and agreed not to institute any legal proceeding

against Gemstar or its customers or Gemstar's customer's products and services within the IPG

Field of Use where such proceeding is based in whole or in part on such products or services.

(*See* Exhibit 1 ¶ 2.5.)

62.

As part of the transaction, PMC and Gemstar also entered into various Non-exclusive

Licenses. As to the Non-exclusive Licenses, the IPG License contemplates that exclusive and

non-exclusive licenses may overlap and provides:

Relationship To Non-exclusive Licenses. This Exclusive IPG License Agreement shall not be construed in any way to be limited, impaired, or superseded by the non-exclusive licenses granted in the Non-exclusive Video On Demand License Agreement, Non-exclusive Personal Video Recording License Agreement, Non-exclusive Gaming License Agreement, Non-exclusive Search Engine License Agreement, or Non-exclusive Consumer Ebook License Agreement executed by the Parties effective as of the Effective Date, or the Non-exclusive Business Ebook License Agreement or the Non-exclusive Professional Gaming License Agreement executed by PMC, PMC Business Programming Services, L.L.C., and TVG-PMC effective as of the Effective Date (collectively the "Non-exclusive License Agreements"). To the extent that the licenses granted in the Non-exclusive License Agreements, or the exercise of those non-exclusive license rights, overlap the licenses granted in this Exclusive IPG License Agreement, or the exercise of these exclusive license rights within the Interactive Program Guide field, this Exclusive IPG License Agreement, and the exclusivity of the license rights granted herein, shall be deemed controlling.

(*See* Exhibit 1 ¶ 2.5.)

63.

Gemstar sought the Non-exclusive Licenses as to certain applications and services as part of a "belts and suspenders" approach to ensure that Gemstar had coverage to the extent any such applications and services were outside the IPG Field of Use.  For example, Gemstar sought the Non-exclusive Video-on-Demand License to obtain additional coverage *e.g.*, Video-on-Demand servers at the head-end (not located on the set-top box).

64.

In December 2000, Gemstar paid PMC $65,000,000 for the various licenses and obtained a 30% ownership interest in PMC.

65.

After the closing of the transaction, for a period of time, Gemstar and PMC worked together to identify potential licensing opportunities.

66.

Gemstar and PMC were involved in a number of legal actions against other entities.

67.

Eventually, communications between PMC and Gemstar became difficult, and PMC purchased back Gemstar's ownership interest in PMC.

68.

In the above-styled action, PMC claims that certain of the Defendants' applications, services and devices, including set-top boxes, receivers, impulse Pay-Per-View, Video-on-Demand and interactive applications, infringe the Harvey Patents.

69.

Certain of the applications, services and devices PMC accuses of infringement in the above-styled action fall within Gemstar's exclusive IPG Field of Use.

70.

Gemstar had previously granted the EchoStar Defendants a license which included licensing of Gemstar's rights in the Harvey Patents.

71.

The EchoStar Defendants' have filed a Motion to Dismiss, and the resolution of the motion will require the court to construe the IPG License.  Any ruling on the EchoStar Defendants' Motion to Dismiss will therefore impact significantly Gemstar and, in particular, its rights under the IPG License.

72.

In direct violation of the IPG License, PMC has filed other actions accusing applications, services and devices that fall within Gemstar's exclusive IPG Field of Use of infringing the Harvey Patents.  (*See Personalized Media Communications, LLC., v. Scientific-Atlanta, Inc. and PowerTV, Inc.*, United States District Court, Northern District of Georgia, No. 1:02-CV-824-CAP; *Pegasus Dev. Corp. v. DIRECTTV*, No. 1:00-cv-01020-GMS (D. Del.))  The courts in these actions have not determined the scope of the IPG License.

73.

Gemstar and PMC have an ongoing disagreement as to the scope of Gemstar's exclusive IPG Field of Use and whether PMC is asserting claims based on rights exclusively held by Gemstar.

74.

Gemstar has a significant interest in the above-styled action and in obtaining the relief requested herein, as any ruling restricting the intended scope of the IPG License will adversely affect Gemstar's business interest, including its licensing business.

75.

Consistent with its primary business, on information and belief, PMC intends to assert additional claims against others, including Gemstar licensees, based on rights held exclusively by Gemstar pursuant to the IPG License.

76.

As a result of PMC asserting claims based on Gemstar's exclusive rights under the IPG License, Gemstar has suffered and will continue to suffer damages.

## COUNT I – DECLARATORY JUDGMENT

77.

Gemstar specifically realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 76 above.

78.

An actual controversy exists between Gemstar and PMC as to whether PMC is accusing of infringement applications, services and devices in the above-styled action that fall within Gemstar's exclusive IPG Field of Use.

79.

An actual controversy exists between PMC and Gemstar as to whether PMC is accusing of infringement in other actions applications, services and devices that fall within Gemstar's

exclusive IPG Field of Use and the exclusive rights obtained by Gemstar pursuant to the IPG

License.

80.

An actual controversy exists between PMC and Gemstar as to the scope of the IPG Field

of Use and the rights obtained by Gemstar pursuant to the IPG License.

81.

Therefore, Gemstar hereby seeks and is entitled to a declaratory judgment declaring the

respective rights of Gemstar and PMC under the IPG License and declaring that PMC has

accused applications, services and devices of infringement that fall within Gemstar's exclusive

IPG Field of Use.

## COUNT II – INJUNCTIVE RELIEF

82.

Gemstar specifically realleges and incorporates herein by reference the allegations

contained in paragraphs 1 through 81 above.

83.

As a direct result of PMC violating the IPG License by asserting claims based on

Gemstar's exclusive rights, Gemstar has suffered irreparable harm.

84.

Unless PMC is enjoined from asserting claims based on applications, services and

devices that are within Gemstar's exclusive IPG Field of Use, Gemstar will continue to be

irreparably harmed.

85.

Gemstar has no adequate remedy of law, and the balance of equities favors Gemstar.

86.

Therefore, Gemstar seeks and is entitled to an injunction against PMC enjoining PMC from asserting claims based on Gemstar's exclusive rights under the IPG License.

87.

WHEREFORE, Gemstar respectfully requests that judgment be entered in its favor and against PMC, including but not limited to:

(1)     Under Count I, a declaratory judgment declaring the respective rights of Gemstar and PMC under the IPG License and declaring that PMC is asserting claims based on Gemstar's exclusive rights under the IPG License;

(2)     Under Count II, a judgment against PMC enjoining PMC from asserting claims based on Gemstar's exclusive rights under the IPG License;

(3)     A judgment awarding Gemstar its litigation expenses, including reasonable attorneys' fees incurred by it in prosecuting its claims; and

(4)     Any other relief that this Court deems just and proper.

## JURY DEMAND

Gemstar hereby demands that all claims in this Third-Party Complaint that are proper for presentation to a jury be tried to a jury.

Respectfully submitted this 25th day of May, 2011.

**GILLAM & SMITH, LLP**          */s/Melissa Richards Smith*
303 South Washington Avenue      Melissa Richards Smith
Marshall, Texas 75670            Texas Bar No. 24001351
Telephone: (903) 934-8450        melissa@gillamsmithlaw.com
Facsimile: (903) 934-9257

**ASHE, RAFUSE & HILL, LLP**     William B. Hill, Jr.
1355 Peachtree Street, N.E.      Georgia Bar No. 354725
Suite 500                        williamhill@asherafuse.com
Atlanta, Georgia 30309-3232      Joseph C. Sharp

Telephone: (404) 253-6000                        Georgia Bar No. 637965
Facsimile: (404) 253-6060                         joesharp@asherafuse.com

                                                               Counsel for TVG-PMC, Inc. and Gemstar-TV
                                                               Guide International, Inc.


# CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 25th day of May, 2011, the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic service.  Local Rule CV-5(a)(3)(A).


                                                               */s/Melissa Richards Smith*
                                                               Melissa Richards Smith

- 19 -